IN THE UNITED STATES DISTRICT COURT
FOR NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: CELLULAR DEVICES ASSOCIATED WITH MIRANDA MOORE and LANDAR MOORE AS DESCRIBED IN ATTACHMENT A | Case No. 3:25-mj-138<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan M. Rosemore being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. Your Affiant is a Special Agent with the Department of Justice United States Drug Enforcement Administration and has been so employed since August 2023. Your Affiant is currently assigned to the Fargo Resident Office and charged with investigating drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code. Your Affiant has received over eight months of law enforcement training with an emphasis on drug trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures at the DEA Academy in Quantico, VA, at the DEA Minneapolis-St. Paul District Office, and the Fargo Resident Office. Your Affiant has been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.

3. Prior to employment with the DEA, your affiant was assigned to the DEA Minneapolis St. Paul District Office, Task Force Group 1 as a Minnesota National Guard Criminal Analyst Contactor for approximately 23 months. During this time, I received training in drug

interdiction, mobile device forensic extractions, money laundering, social media exploitation, criminal street gangs, and intelligence analysis in High Intensity Drug Trafficking Areas. I have participated in investigations concerning the possession, manufacture, and distribution of controlled substances. I am familiar with the methods narcotic traffickers use to finance drug transactions and launder drug proceeds.

4. Your Affiant is familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers distribute drugs, and the ways that drug traffickers use cellular telephones to facilitate their activity. Drug traffickers also use numerical codes and code words to conduct their transactions. In your Affiant's experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their activities from law enforcement.

5. The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation and through conversations with other investigators with the DEA and other law enforcement officers, as well as reviewing reports and documents prepared by investigators investigating this matter. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

## PURPOSE OF THE AFFIDAVIT

6. I submit this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seize data and records from a cellular communication device, specifically described as:
    a. **DEVICE #1** – Grey Motorola phone with a black case belonging to Miranda Moore. The above described cellular telephone will be referred to as DEVICE #1 hereinafter. The Device is currently in the custody of the Cass County Drug Task Force of Fargo.

    b. **DEVICE #2** – Blue Samsung phone with no case belonging to Landar Moore. The above described cellular telephone will be referred to as DEVICE #2 hereinafter. The Device is currently in the custody of the Cass County Drug Task Force of Fargo.

7. Through my training and experience, I am aware that individuals who deal in illegal controlled substances commonly use cellular telephones to maintain addresses; telephone numbers; bank account information, including deposit amounts, names and numbers; drug and money ledgers; directions and instructions; travel, time, and route navigation information; and other information specific to drug dealing. In addition to continuing their illegal businesses, these individuals often utilize cellular phones to maintain contact with their criminal associates; to access the internet; to transact banking and other financial business over the internet; and to keep records of these transactions on the computer memories. Oftentimes, travel, transportation, and transaction instructions are sent and received via text message, e-mail, or instant messages which are stored on the digital memories of these devices. Internet e-mail providers require little or no personal information to activate e-mail accounts used to give directions and to report progress in furtherance of the illegal drug trade. These e-mail messages are stored on the memories of the cellular telephones. Memory in cellular telephones includes internal memory, and memory storage on removable devices such as SIM cards and SD cards. In addition, some devices have built in electronic digital cameras and digital video capabilities. Individuals who deal in illegal controlled substances often take, or cause to be taken, photographs of themselves their associates their properties and their illegal products and merchandise. Lastly, I know that cellular telephones can store information for long periods of time, and even if records are deleted, many times, through the use of forensic tools, the records may be retrieved.

8. Searching for the evidence described may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other

cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information; encode communications to avoid using keywords; attempt to delete information to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require law enforcement officers or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in the Attachments, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA intends to use whatever data analysis techniques necessary to locate and retrieve the evidence sought.

## TECHNICAL TERMS

9. Based my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

    connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Digital display device: A digital display device is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network or internet network. Some devices enable the user to send, as well as receive, text messages.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or other such device attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers or other such device have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10. Based on my training, experience, and research, I know that the device(s) described in this affidavit as **DEVICE #1** and **DEVICE #2** commonly have capabilities that allow them to serve various functions, including, but not limited to, a wireless telephone; a digital camera; a portable media player; a GPS navigation device; a digital display device, and a PDA with an internet connection. In my training and experience, examining data stored on cellular telephones of this type can uncover, among other things, evidence which reveals or suggests the identity of the person or persons who possessed or used the device as well as information regarding criminal activities and criminal conspirators.

## SEARCH PROCEDURE

12. In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedures. Even though the items are currently within the custody of the Cass County Drug Task Force, to ensure the proper forensic search and examination of the DEVICE #1 and DEVICE #2, it may be necessary to remove the items to a DEA forensic laboratory and/or the North Dakota Bureau of Criminal Investigation office in Fargo, North Dakota. Here, because no computer personnel were present at the execution of the original search warrants and it was determined that a digital device could not be searched or imaged on site within a reasonable amount of time and without jeopardizing the ability to preserve data, the digital devices were seized and transported to an appropriate law enforcement laboratory for preservation and subsequent review.

13. Law enforcement personnel will examine the digital device to extract and seize any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B. To

the extent they discover data that falls outside the scope of the warrant that they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an additional warrant.

14. Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

15. If the digital device was seized or imaged, law enforcement personnel will perform an initial search of the original digital device or image within a reasonable amount of time not to exceed 180 days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues regarding contamination of the evidence. If the government needs additional time to determine whether an original digital device or image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 180-day period from the date of execution of the warrant. The government shall complete the search of the digital device or image within 180 days of the date of execution of the warrant. If the government needs additional time to complete the search, it may seek an extension of the time period from the Court within the original 180-day period from the date of execution of the warrant.

16. If, at the conclusion of the search, law enforcement personnel determine that files or file folders on an original digital device or image do not contain any data falling within the list of items to be seized pursuant to the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the list of items to be seized pursuant to the warrant, as well as data within the operating system, file system, or software application relating or pertaining to files or data falling within the list of items to be seized pursuant to the warrant (such as log files, registry data, and the like), through the conclusion of the case.

17. If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original data device to its owner within a reasonable period following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

## FACTS AND OPINIONS

18. In January of 2025, DEA Fargo received information from TFO Raymond Mosley with the Cass County Drug Task Force regarding information he received from a Cooperating Criminal Defendant (hereinafter referred to as CCD). The CCD stated to Detective Mosley that they purchased powder fentanyl from a white male they know as "Alan." The CCD said that "Alan" drives a white Range Rover and believes he lives in the Grand Forks area. The CCD has met "Alan" in East Grand Forks, outside Grand Forks, ND, and in Fargo, ND. The CCD provided the CashApp username "Alienalkn." for "Alan." The CCD has purchased 1 to 2 ounces of powder fentanyl from "Alan" for approximately $1000 an Oz. in the past.

19. A phone number associated with the CashApp account is (218) 280-1372 a Verizon Wireless number. When the Target Telephone Number is entered in opens-source databases they reveal this number is used by Jason James Isaacson. Isaacson lists this number as a business phone number for the store he operates, Discount Den at 113 N Main St, Crookston, MN.

20. A search of Isaacson's criminal history in systems maintained by law enforcement show that Issacson has convictions for 1st degree CSC and burglary (1999), 2nd degree possession of drugs, theft and burglary(1999), robbery and Felon in Possession of a firearm (2002), 3rd degree sale of narcotics (2007), felony domestic assault (2007), 2nd degree sale of drugs (2008), introduction of contraband into a state prison (2009) and failure to comply with sexual offender requirements (2024).

21. Your Affiant is aware that on January 7, 2025, Detective Mosley applied for and was granted a Court Order from the state of North Dakota to receive GPS information from the Target Telephone Number and for the installation of Pen Register Trap Trace (PRTT) device on the Target Telephone Number. On January 8, 2025, Your Affiant and Detective Mosley began receiving the requested data from Verizon for the Target Telephone Number.

22. Your Affiant is aware that on January 13th, 2025, Detective Mosey obtained a state of North Dakota search warrant for the installation of a tracking device on a 2020 white Land Rover Range Rover with Minnesota license plate EWA545 registered to and operated by Isaacson. On the same date at approximately 6:13 pm, Your Affiant placed a GPS tracking device on

Isaacson's white Range Rover with Minnesota license plate EWA545, VIN: SALZT2GX8LH064685. The vehicle was parked and unoccupied in the parking lot at 2801 32nd Ave N, Fargo, ND 58102.

23. On January 14, 2025, Your Affiant and Detective Mosely were monitoring GPS data from Isaacson's cellular device and a GPS tracking device placed on his White Range Rover. The data from Isaacson's cellular device and GPS vehicle tracking device indicated that the vehicle was traveling south of Crookston, MN, towards the Moorhead, MN, area. Surveillance units followed Isaacson's vehicle to 1522 E Gateway Cir, Fargo, ND. Your Affiant is aware that Detective Mosley observed Isaacson's vehicle parked on the northside of 1522 E Gateway Cir. A few moments later, he observed a female, later identified as Miranda Moore, DOB 08/26/1982, walking from the east side of 1522 E Gateway Cir and entering the front passenger seat of Isaacson's vehicle. The vehicle then left the area. Detective Mosley followed Isaacson's vehicle to the Applebee's, 2800 13th Ave SW, Fargo, ND 58103. The vehicle was parked on the south side of Applebee's restaurant, next to a black Lincoln Nautilus bearing North Dakota license plate 094EEN. Your Affiant observed Moore get out of Isaacson's vehicle, walk over to the black Lincoln, and get into the front passenger seat of the black Lincoln, a few minutes later, Your Affiant observed Moore get out of the black Lincoln, walk back over to Isaacson's Vehicle, and get into the front passenger seat of Isaacson's vehicle. A short time later, Your Affiant observed Isaacson's vehicle depart the Applebee's parking lot. Surveillance units followed Isaacson's vehicle back to 1522 E Gateway Cir, Fargo, ND, where Isaacson's vehicle parked on the south side of the apartment building. Surveillance units observed Moore exit Isaacson's vehicle and walk to the east side of the 1522 apartment building. Surveillance units did not see Moore enter 1522 E Gateway Cir.

24. In late January of 2025, Your Affiant and members of DEA Fargo assisted the Cass County Drug Task Force with a controlled purchase operation with the use of a Confidential Informant (CI) for the purchase of approximately 5.9 grams of suspected powder Fentanyl. Your Affiant is aware that the controlled purchases occurred at 1522 E Gateway Cir S Apartment #305, Fargo, ND 58103. Your Affiant is aware that before the controlled purchases, the CI was searched for contraband by TFO Gossen, and no contraband was located. Surveillance Officers observed the CI enter the 1522 E Gateway Cir S, Fargo, ND, apartment building and exit the building a short time later. Your Affiant is aware that after the controlled purchase, the CI turned over approximately 5.9 grams of suspected powder fentanyl to TFO Gossen. Your Affiant is aware that after the controlled purchase, the CI was searched for contraband by TFO Gosson, in which no contraband was located. Your Affiant is aware that after the controlled purchase, Detective Mosley performed a presumptive narcotics test on the suspected fentanyl with the TruNarc. The TruNarc identified the suspected fentanyl as Acryl fentanyl.

25. On February 7, 2025, Your Affiant is aware that TFO Mosley, TFO Gossen, and TFO Holte met with the CI at a predetermined location to speak. The CI stated that during the controlled purchase with Miranda Moore in late January of 2025, they went to the 1522 E Gateway Cir S, Fargo, ND, apartment building to meet Miranda Moore. CI stated that Miranda Moore let the CI into apartment #305. The CI indicated that they received suspected fentanyl from Miranda Moore. The CI identified Miranda Moore by a photograph line that TFO Mosley provided. The CI stated the transaction occurred in the back bedroom inside apartment #305.

26. On February 18, 2025, Your Affiant, Members of DEA Fargo, and Members of the Cass County Drug Task Force executed a state of North Dakota search warrant at 1522 E Gateway Circle Apt #305, Fargo, ND. At the time of execution three people were located inside the apartment, Miranda Moore, Landar Moore, and Troy Woods. During the search, several suspected drug exhibits were found. At the time of entry Landar Moore was in the shower in the bathroom and DEVICE #2 was located on the bathroom counter. Also, in the bathroom a small pink plastic baggie with suspected methamphetamine was found on the floor next to the toilet. Also located in and around the toilet were multiple small pink plastic baggies and drug paraphernalia. In your Affiants training and experience it is a common tactic of drug dealers to destroy evidence by flushing drugs in the toilet. After the search, Landar Moore provided the password to DEVICE #2.

27. DEVICE #1 was found in the south bedroom in a black purse. Inside the purse was a small amount of marijuana and an empty pink plastic baggie matching the pink plastic baggies found with the suspected methamphetamine. Inside the black case for DEVICE#1 was a State of North Dakota ID for Miranda Moore. During a post Miranda Interview Moore gave your Affiant consent to search her phone and provided the password 2009 for DEVICE #1. Your Affiant located a CashApp account for Miranda Moore which revealed she had sent over $7,000.00 to Isaacson via CashApp.

28. Based upon my training, education, and experience in conducting narcotics investigations, Your Affiant knows it is common for drug traffickers to obtain and utilize cell phones to message users and facilitate the sale of controlled substances. Your Affiant is also aware that persons who traffic in controlled substances generally keep records, notes, receipts, ledgers, logs of buyers and sellers, transaction amounts, and other similar documentation of their drug trafficking activity. Drug traffickers also utilize cellular phones to engage in drug trafficking, including through text messaging, social media, and phone calls. I am aware that cellular telephones have various features that save information, data, and images on the cellular telephone that are later accessible to the user. That information includes matters such as calls made, calls received, missed calls, text messages sent and received, contact lists, and photographic and video images. Some of this information can be maintained on media storage devices that may be inserted into the cellular phone. Further, Your Affiant has

participated in numerous investigations related to the distribution of cocaine, heroin, illicit opiate pills and other controlled substances wherein cellular phones have been utilized by these drug traffickers. During searches of cellular telephones seized from those individuals, the phones almost always have conversations in text messages and other messaging applications, such as "WhatsApp", "Facebook Messenger" and "Snapchat," where users of the phone are arranging drug deals, and communicating with drug purchasers or sources of supply. Your Affiant has also observed numerous photos on such cellular phones where drug traffickers take photos and/or videos of themselves with large amounts of US Currency, of their drug products, and of firearms. Often times, these drug traffickers will send photos of their products to the people purchasing them. They will also often times request those who are laundering drug proceeds to send images of money wire transactions or receipts, or deposit record in financial institutions.

29. Based on my training and experience, consultation with other law enforcement officers experienced in investigations regarding narcotics trafficking and the forensic examination of computers, computer tablets, cellular telephones and digital media, I have learned the following:

   a. A thorough search of computers, computer tablets, cellular phones and digital media for evidence of instrumentalities of crime commonly requires a qualified expert to conduct the search in a laboratory or another controlled environment.
   b. Searching computers, computer tablets, cellular phones and digital media is a highly technical process which requires specific expertise and specialized equipment. There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with personnel who have specific expertise in the type of computer, computer tablet, cellular phone and digital media that is being searched.
   c. Searching computers, computer tablets, cellular phones and digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment,

    such as a law enforcement laboratory, is essential in conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

  d. Therefore, in searching for evidence, fruits, and instrumentalities of criminal activity within cellular telephones or other digital or electronic media, those items will need to be transported to an appropriate law enforcement laboratory for review to determine whether the contents thereof contain evidence and instrumentalities of violations of federal law. These items and the contents thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence in violation of Title 21, United States Code, Sections 841, 843, and 846, and Title 18, United States Code, Sections 922(g), 924(c), 1956, and 1957.

30. I am requesting authorization to search DEVICE #1, DEVICE #2, and inserted media storage devices for all records, communications, data, and images, in whatever form and by whatever means they have been created or stored on such cellular telephones and storage devices relating to violations of 21 USC § 841(a) (drug trafficking); 21 USC § 843(b) (use of a communications facility); 21 USC § 846 (conspiracy to traffic drugs); 18 USC 922(g) or 924(c) (firearms offenses); and 1956 and 1957 (money laundering), involving Miranda Moore and Landar Moore and any unknown, or yet to be identified subjects, including lists of drug customers and related identifying information; types, amounts and prices of drugs purchased, used or trafficked, or offered for purchase or sale, as well as dates, places, and amounts of specific transactions; any information related to sources of narcotic drugs (including names, addresses, phone numbers, images, or any other identifying information); photographic or video images of drugs, drug paraphernalia, money or monetary instruments, drug use or drug transactions, and firearms; any information recording the travels of Miranda Moore, Landar Moore, and any unknown, or yet to be identified subjects; and any financial account and transaction information.

31. Based on the above paragraphs, Your Affiant believes that probable cause exists for the issuance of a search warrant allowing Your Affiant access to the DEVICE #1, DEVICE #2, and that the DEVICE #1 and DEVICE #2 contain electronic stored data which constitutes

evidence of the commission of a criminal offense, or data intended for use which is or has been used as the means of committing a criminal offense.

32. Your affiant further requests that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

33. In accordance with Title 18, United States Code, 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), your affiant further requests that the warrant delay notification of the execution of the warrant for 90 days because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in Title 18, United States Code, 2705. Your affiant would like to inform the Court that the investigation is still very active and involves (a) cooperating informant(s). Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

34. Your Affiant, with assistance from a sworn communication device forensic specialist, therefore requests authorization to search and analyze the aforementioned cellular telephones for data relative to criminal offenses.

The affiant states that the above statements are true and correct to the best of his knowledge, information, and belief.

Ryan M. Rosemore
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 21st day of February, 2025.

Alice R. Senechal
United States Magistrate Judge